## Case No. 9,684.

### The M. M. CHASE.

#### [2 Hask. 270.] [1]

District Court, D. Maine. Oct., 1878.

COLLISION — CLOSE-HAULED — RULE 16 — DUTY TO PORT HELM—STARBOARD TACK—LOOKOUT—WITNESS—TESTIMONY MANIFESTLY UNTRUE.

1. The testimony of the respective owners of colliding vessels being manifestly untrue, the court considered the testimony of a competent witness, who saw the collision from the land, the most reliable evidence.

2. Colliding vessels, sailing with a north wind, one a course east by north within seven points of the wind, and the other west by north two points free, are neither close-hauled.

3. Vessels so sailing approaching each other end on and in danger of collision, one upon the port tack and the other upon the starboard tack, should, under rule 16, both seasonably port their helms.

4. Those in charge of vessels so approaching each other have a right to presume that rule 16 will be seasonably complied with; and if one vessel puts her helm aport soon enough to avoid a collision if the other should do the same at the same time, she is blameless; and if a collision ensue, for failure to so port the helm, the vessel failing to do it would be in fault, and liable for the damages.

5. If vessels approaching in opposite directions on courses diverging two points, neither being close-hauled, are not governed by rule 16, the vessel on the port tack must keep clear of the vessel on the starboard tack.

6. A lookout must be kept to apprise the man at the helm of approaching vessels.

This was a libel in rem by the master and owners of the Emma B. Shaw against the M. M. Chase for damages from collision of the two vessels, occasioned by fault of the Chase. The owners of the Chase filed their answer, denying any fault on the part of the Chase, and the cause was heard upon libel, answer, and proofs.

George F. Holmes and A. A. Strout, for libelants.

Geo. E. Bird and William W. Thomas, for claimants.

FOX, District Judge. This libel is instituted against the schooner, M. M. Chase, of Portland, by the master and owners of the schooner, Emma B. Shaw, of Philadelphia, to recover for damages sustained by the Emma B. Shaw, from a collision with the M. M.

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

Chase, on the morning of February 19, 1878, which took place at the western entrance of the Vineyard Sound, between the lightship and Cuttyhunk island.

The Emma B. Shaw was a schooner of two hundred and forty-eight tons, loaded with ice, bound from Boothbay to Philadelphia. The M. M. Chase was bound from Virginia to Portland, with a cargo of oysters.

The libel alleges that the course of the Emma B. Shaw at time of collision, was west-northwest, and that she was on her starboard tack, close-hauled, with the wind north by west; and that the M. M. Chase was seen two or three miles off, on a course of east by north with free wind.

The answer admits that the M. M. Chase was sailing on a course east by north, but avers that the wind was north-northeast 'to northeast by north, and that she was on her port tack close-hauled; that the Emma B. Shaw was first seen on the starboard bow of the M. M. Chase, about a half-mile distant, sailing on a course west-southwest, with the wind free, and that the Emma B. Shaw afterwards changed her course to the northwest, and thereby occasioned this collision.

The master and mate of the Emma B. Shaw, in their depositions, fully sustain all the allegations in the libel; and on the other hand, the testimony of the master, mate, and one of the seamen of the M. M. Chase, corroborates the allegations in the answer. Each side has also produced the testimony of a witness from the island of Cuttyhunk.

Albert F. Church, a pilot, who is the son-in-law of Mr. Smith, the light-keeper, testifies in his deposition that he was on the island that morning watching for a vessel which he expected to pilot through the sound; that he saw both the schooners from where he stood previous to the collision; that he did not see them when they were together, but saw them after the collision; that the wind was about north by west, a good wholesale breeze, and so continued through the morning; that the Chase was on her port tack, heading about east by north, but for a portion of the time she was obscured from his sight by a barn. He says, "Her sheets were off some, cannot tell exactly how much, but so that I could notice them distinctly; she was not close-hauled, but was running free with her boom about one third of the way off, as I should judge. About half an hour after seeing the M. M. Chase, I saw the top of the Emma B. Shaw sail across the hollow in the island; she came out by, so that I could see her hull in twenty or thirty minutes; she was then on her starboard tack, was not close-hauled, heading about west as near as I could judge; the vessels then were two or three miles apart; she afterwards luffed up into the wind, trimmed off and was headed north by west as near as I could tell; she was close-hauled, sharp to the wind, heading west-northwest as near as I could tell; I should judge the vessels were about a mile or more

apart; the two vessels were within an eighth of a mile of each other when I last saw them before the collision."

On cross examination, he says, "The true course for a vessel through the sound and bound to Philadelphia is about west by south; the wind was quite steady that morning; it very likely blew by flaws, as far eastward as north. I did not look at any compass, there was a vane in sight; I did not look at the vessels after they were within a mile of each other, because I stepped into the house to do something or other. If the Emma B. Shaw had kept on the course she was on when I first saw her, the collision would not probably have occurred."

S. Austin Smith, the keeper of Cuttyhunk light, was called by claimants, and testified that at about 6.40 on morning of February nineteenth, "I went up into the lantern of the lighthouse and saw the M. M. Chase coming in on a course of east by north. I saw the collision. The vessels were about S. S. W. from the lighthouse at the time; the wind was due north, veering round to N. N. E.; the two vessels came nearly end on, and I watched them, fearing a collision; they were neither of them close-hauled; they both held their course, the Emma B. Shaw being a little southerly until a moment before the collision, and then the E. B. Shaw put her helm hard to port and came under the bow of the M. M. Chase, and the collision occurred almost immediately; the M. M. Chase did not change her course. I noticed the course of the wind at the time of the collision, which took place about a mile from me. The sun was up and as clear a day as ever was. Saw the man at the wheel of the M. M. Chase exerting himself to bring her up into the wind. If the E. B. Shaw had starboarded her helm, the vessels would have gone clear. The wind, at the time, varied from N. N. E. to N. by W. at lighthouse. The E. B. Shaw would have passed to the north of the lightship, I think. She changed her course a little after she opened by the bluff of the island, and steered a little more to the north. My attention was fixed on the vessels, as I expected a collision; they were two hundred to two hundred and fifty feet apart when the E. B. Shaw ported her helm. If both vessels had held their course, think a collision would have occurred. After leaving Tarpaulin cove, the course of the E. B. Shaw, with wind north, would have been about west by south, to pass near the lightship. I suppose she may have kept on to north of that, when I saw her, to go north of lightship. She may have kept up to north of west, say a point, a point and a half."

In the present case, as in most others of a similar character, there is an irreconcilable conflict in the testimony of those on board the respective vessels upon material points, upon which the court has not the charity to believe that the differences are wholly owing to errors of judgment. The officers and crew of colliding vessels most usually are quite ready to exonerate themselves from blame by statements, which upon careful examination and comparison with the testimony of disinterested spectators, if to be had, are generally shown to be gross perversion of the facts as they actually occurred.

In this case, all of the evidence is in deposition, excepting that of Smith, the lighthouse-keeper; and the court, not having had the other witnesses before it, has not had the opportunity of seeing them, and, from their appearance, forming its own judgment as to what extent they may have designedly misrepresented the state of the wind and other matters at the time of the collision. It is sufficient to say, that this testimony, on one side or the other, is most manifestly untrue; and in the opinion of the court this remark is not applicable exclusively to the witnesses on either side; but on both sides, the facts have been so much perverted by them, that the court is not inclined to consume any time in attempting to discern if either approximates to the truth, or which side is farthest therefrom. Mr. Smith, the keeper of Cuttyhunk light, was produced as a witness at the hearing, and while he manifested some peculiarities as a witness, the court was impressed with his truthfulness, and is of opinion that he intended to give a correct statement of what occurred when the collision took place. He has followed the sea forty years; been fourteen years keeper of the light; has had charge of one of the coast life-stations; and is manifestly a man of experience in maritime matters, and of standing character.

He says, he watched the vessels until the collision occurred, fearing from their respective courses, as they were nearly end on, that they would collide. He swears that they were only a mile distant from him, and that he noticed the wind at the time, and it was due north, varying by spells from N. by W. to N. N. E. Smith was up in the lantern of the lighthouse with a clear unobstructed view through the light of plate glass, and with a vane before him, and with his experience of fourteen years in that office, could not but have known the exact course of the wind. Church, his son-in-law, was on the ground, and represents the wind as about N. by W. He is not positive and precise upon this point, while Smith is; and it may be that, at the moment that Church noticed the wind, it may have been in the direction stated by him; but the court is inclined to accept the statements of Smith upon this point, on account of his exactness upon a matter, in respect to which, if observed by him as he says, he could not be mistaken.

The testimony by deposition of these pilots has been taken by claimants, and they say that, on the morning of the collision, they were in the vicinity of Gay Head, and that the wind then was north-northeast. It is not improbable that such was the course of the wind further up the sound, as the testimony tends to show that the wind frequently hauls

more to east of north after passing the northern entrance of the sound; so that, with the wind north at Cuttyhunk, it might be two or three points to the eastward when near Gay Head. Upon the whole case, my judgment is, that the wind was north where the collision occurred, and if so, the M. M. Chase, being on a course of east by north, as is admitted by both sides, was sailing within seven points of the wind, which gave her a free course, and she could not have been closehauled.

Mr. Smith swears that neither vessel was close-hauled; and whether this was so or not must depend on the course of the E. B. Shaw with a northerly wind. I am inclined to the opinion that, after she passed the bluff on Cuttyhunk, she at first was on a westerly course, which was changed, as Church says, soon afterwards more northerly; and this statement of Church finds corroboration in the testimony of Smith, who thinks that, after passing the bluff, she hauled more northerly, intending to go inside of the lightship, which, according to Smith's statement, would give her a course one to one and one-half points north of west, say about west by north, which I am inclined to think was the course she was on just previous to the collision.

With a north wind, sailing west by north, the Emma B. Shaw must have been two points free; and I therefore find that neither vessel was close-hauled. I am aware that Church says the Emma B. Shaw was closehauled, and he gives the course when he saw her as about N., N. W.; but he does not pretend to be exact; and I prefer to rely on Smith's testimony, which is positive, that neither vessel was close-hauled. This view draws some strength from the fact that the two vessels were so approaching each other that Smith feared a collision would take place. This might be with one sailing E. by north and the other W. by N., which were within two points of directly opposite courses; but, if the divergency was much greater, it could never have occurred to Smith that they might come together.

Neither vessel being close-hauled, but one so sailing on a port tack, and the other on her starboard tack, what was required of each vessel? If the case is to be considered as within rule 16, applicable to vessels meeting end on or nearly end on, the helms of both should be put to port. The M. M. Chase did nothing but hold her course, so that she clearly violated this rule. The Emma B. Shaw ported her helm; but it is claimed that it was not seasonably done; that she hailed the M. M. Chase, and received no reply, and therefore she should have understood that those on board of the M. M. Chase were not aware of her approach, and that the Emma B. Shaw should have, at once, under rule 24, taken such measures as were necessary to avoid the collision.

It is sufficient answer, in the opinion of the court, that those on board of the Emma B. Shaw must have known that the Chase had a man at the helm whose duty it was to comply with the rules so long established, and that those in charge of the Emma B. Shaw had a right to act on the presumption that these rules would be obeyed. If such had been the case, and the helm of the M. M. Chase had been ported at the same time as the Emma B. Shaw's, both vessels would have passed without contact as, in the short time remaining, the course of the Emma B. Shaw, by this movement, was changed nearly to right angle, as she was struck amidships, nearly head on, by the M. M. Chase.

In this view, the fault was entirely that of the M. M. Chase; and while the Emma B. Shaw was somewhat dilatory in her change of course, it would have been successful, if the other vessel had done the same at the same time.

The answer alleges that the course of the Emma B. Shaw was about west-southwest, which would bring the two vessels end on, and require from the M. M. Chase a compliance with rule 16, as neither vessel was close-hauled. On her own admissions, the M. M. Chase was in fault; and it does not appear that the conduct of the Emma B. Shaw was so in violation of the rules, as to render her accountable for the damages incurred.

It is not yet absolutely decided, so far as the court is advised, that two vessels, approaching in opposite directions on courses diverging two points, are to be governed in their movements by rule 16. See The Manitoba [Case No. 9,029]. Doubts have certainly been suggested, in some cases, that in such position the vessels are not to be deemed as meeting end on, or nearly end on; but rather that they come within rule 17, which requires of two sail vessels, when crossing so as to involve risk of collision, if they have the wind on different sides, that the vessel with the wind on the port side shall keep out of the way of the vessel with the wind on the starboard side; except when the vessel with the wind on the port side is close-hauled and the other vessel free, in which case, the latter vessel should keep out of the way.

Neither being close-hauled, it was the duty of the M. M. Chase, as she was on her port tack, to keep out of the way of the Emma B. Shaw, she being on her starboard tack. The M. M. Chase, it is conceded, did nothing; and the Emma B. Shaw held her course as she was required to do until the collision was imminent. Within a moment of the collision, as Smith says, she then ported her helm, her helmsman having a right to presume that the approaching vessel would do the same, as it would bring her more before the wind and allow her to pass, and in that way "keep out of the way of the other vessel."

If the Emma B. Shaw had pursued a different course and starboarded her helm, and the M. M. Chase had ported hers, then a collision must have been inevitable, and the M. M. Chase might have well been held chargeable for the consequences. On the contrary, she

did what it was her duty to do, attempted to get away from the M. M. Chase when it was evident that the two vessels would come together, unless something was done to prevent it, acting on the presumption, that the M. M. Chase would endeavor to accomplish, in the easiest way, the same purpose; this she failed to do. She was, moreover, in fault for want of a proper lookout, who should sooner have discovered the other vessel and notified the man at the helm of her approach, and must be held accountable to the Emma B. Shaw for the damages so occasioned by her neglect. Decree for libelants.

MOBERLY (JARROTT v.). See Case No. 7,-223.

MOBILE (KIMBALL v.). See Case No. 7,-774.

MOBILE (SIBLEY v.). See Case No. 12,-829.

MOBILE & O. R. CO. (DUNCAN v.). See Cases Nos. 4,137–4,139.

MOBILE & O. R. CO. (KETCHUM v.). See Case No. 7,737.

MOBILE LIFE INS. CO. (BERRY v.). See Case No. 1,358.

MOBILE SAV. BANK (WILLIAMS v.). See Case No. 17,729.

MOCKBEE (GODDARD v.). See Case No. 5,493.